Michael McShane (SBN 127944)
Ling Y. Kuang (SBN 296873)
Thom E. Smith (SBN 203362)
  mmcshane@audetlaw.com
  lkuang@audetlaw.com
  tsmith@audetlaw.com
**AUDET & PARTNERS, LLP**
  711 Van Ness Avenue, Suite 500
  San Francisco, CA 94102-3275
  Telephone:   (415) 568-2555
  Facsimile:   (415) 568-2556
*Counsel for Plaintiff, individually,*
*and all others similarly situated*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN  DISTRICT OF CALIFORNIA**

**FRESNO DIVISION**

| | |
|---|---|
| LOUISE HUDIS, on behalf of herself and all others similarly situated,<br><br>                    Plaintiff,<br><br>        v.<br><br>QUINCY BIOSCIENCE HOLDING COMPANY, INC., a corporation; QUINCY BIOSCIENCE, LLC, a limited liability company; PREVAGEN, INC., a corporation d/b/a SUGAR RIVER SUPPLEMENTS; QUINCY BIOSCIENCE MANUFACTURING, LLC, a limited liability company; MARK UNDERWOOD, individually and as an officer of QUINCY BIOSCIENCE HOLDING COMPANY, INC., QUINCY BIOSCIENCE, LLC, and PREVAGEN INC.,<br><br>                    Defendants. | Case No: **1:25-cv-01357-JLT-CDB**<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, LOUISE HUDIS,  brings this action on behalf of herself and all others similarly situated

against Defendants QUINCY BIOSCIENCE HOLDING COMPANY, INC., a corporation; QUINCY

BIOSCIENCE, LLC, a limited liability company; PREVAGEN, INC., a corporation d/b/a SUGAR

RIVER SUPPLEMENTS; QUINCY BIOSCIENCE MANUFACTURING, LLC, a limited liability company (hereafter referred to as the "Quincy Corporate Defendants"); MARK UNDERWOOD, individually and as an officer of QUINCY BIOSCIENCE HOLDING COMPANY, INC., QUINCY BIOSCIENCE, LLC, and PREVAGEN INC. (together, "Defendants") and alleges upon personal knowledge as to her own acts and experiences and, as to all other matters, upon information and belief:

## FACTUAL ALLEGATIONS

### *Prevagen*

1.     Surveys show that persons over 50 are more fearful of memory loss/Alzheimer's/dementia than they are of cancer.

2.     Defendants are aware of the importance to consumers of improving memory, focus, concentration, recall and brain function and have, and continue to, design, manufacture, promote, market, advertise, package, label, distribute and sell Prevagen touting brain function claims and benefits as described more fully below.

3.     Thus, until recently (shortly after the entry of a nationwide injunction entered on December 6, 2024 against the Quincy Corporate defendants with regard to the representations which are the subject of the lawsuit by the court in the Southern District of New – *FTC v Quincy Bioscience et al*., case no. 17-cv-00124 LLS) (attached as Exhibit A)), Defendant Underwood and the Quincy Corporate defendants  designed and configured the Prevagen packaging and their nationwide television advertising (the centerpiece of all Prevagen marketing – as the label was what consumers saw when they saw the packaging, saw television ads or went to the Prevagen web site) to prominently display – on the front of the Prevagen labeling or in their television advertising the "pre-injunction brain health representations" – that Prevagen provides healthy brain function, memory improvement, sharper mind and clearer thinking. These representations alone or in combination led reasonable consumers to believe that if they took Prevagen as directed that they will obtain brain health benefits.

4.     Likewise, pre-injunction, Defendant Underwood directed the Quincy Corporate Defendants to and the Quincy Corporate Defendants did include the pre-injunction brain health representations on the front of the Prevagen labeling as well as directing the Quincy Corporate Defendants to also include the labeling or its content in television ad. The brain pre-injunction health

representations were and are false and misleading as more fully set forth below.

5.    After the injunction was entered the Quincy Corporate Defendants changed their marketing message to "Prevagen – For Your Brain" and removed the "clinically tested" representation. These new representations and television ads are also false, misleading or deceptive, as Prevagen cannot and does not provide any health benefits let alone anything for one's brain, but these representations and the post-injunction advertising claims will be the subject of a separately filed lawsuit on hehalf of a consumer who purchased in reliance upon these post-injunction representations.

6.    Reasonable consumers, like Plaintiff trust supplement manufacturers like Defendants to market and sell dietary and brain supplements which when ingested as directed will provide the represented and promised brain health benefits.

7.    Since at least the fall of 2007 until sometime after the injunction was entered on December 6, 2024, Defendants manufactured, distributed, marketed, and sold the purported brain health supplement - Prevagen. The "Prevagen Products" were, until shortly after the entry of the injunction in a case brought by the FTC and the state of New York against the Quincy Corporate Defendants and discussed below,[1]  marketed as a dietary supplement that purportedly provides a variety of brain health and brain function claims such as:

(a)    providing "healthy brain function",

(b)    providing "memory improvement",

(c)    providing a "sharper mind" and

(d)    providing "clearer thinking"[2]

(hereafter – referred to as the "pre-injunction brain health representations").

8.    And while the package labeling may have changed over the pre-injunction years the same

---

[1]  Defendant Underwood is also a named defendant in the FTC's case and presently the plan is for a bench trial to take place on these claims in the future.

[2] The last visit of the Prevagen web site, for purposes of this complaint took place on October 4, 2023 and as set forth above, the Prevagen bottle with the "pre-injunction brain health representations" were made.  Plaintiff's counsel attempted to retrieve these older web pages via the Wayback machine and were blocked from doing so. However, these same representations were depicted on the Prevagen bottle and used as well on the Defendants' web site as discussed throughout the complaint. Likewise, pre-injunction ads are still available at ISpot.tv (https://www.ispot.tv/brands/oTh/prevagen).

consistent message was, as set forth below, is still made – take Prevagen and receive benefits for your brain.

9.      Similarly, prior to the injunction Defendants ran a robust years long nationwide television advertising campaign prominently displaying the front label of the Prevagen products as well as expressly stating such things as that Prevagen improved one's memory or ending the ads with taglines like "Prevagen – healthier brain better life."  The substance of all of the television ads were the same – take Prevagen and your brain will function better than before.  See e.g. https://www.ispot.tv/ad/5LWa/prevagen-daniel;           https://www.ispot.tv/ad/1p2t/prevagen-todd; https://www.youtube.com/watch?v=-MNWQGbXA2A         ;https://www.ispot.tv/ad/oDZ1/prevagen-concerns;      https://www.ispot.tv/ad/2k22/prevagen-aline;      https://www.ispot.tv/ad/fuAQ/prevagen-barbara;    https://www.ispot.tv/ad/63L0/prevagen-sally;    https://www.ispot.tv/ad/5HNr/prevagen-steve-and-lea-memory.  These ads are just a few as it appears that many of the ads were scrubbed from the internet after the injunction was entered.

10.     As part of its marketing and advertising plan to induce Plaintiff and the Class to purchase Prevagen, Defendants intended for Plaintiff and the members of the Class to rely on these pre-injunction brain health representations when Plaintiff and Class members purchased Prevagen. As discussed more fully below, Defendants were successful and Plaintiff did rely on these representations and purchased and took Prevagen as directed, believing she would obtain the represented and promised brain health benefits.

11.     Thus, for the reasons set forth below in greater detail – e.g. well-established body chemistry science as well as the results of the one clinical trial conducted on Prevagen – Prevagen does not and cannot provide any of the "pre-injunction brain health" benefits, as Prevagen can provide nothing more for your brain than an infinitesimal amount of generic amino acids or small peptides and is no different than any other miniscule amount of other common everyday dietary proteins all of which are digested and used as needed by the trillions of cells in our bodies without there being any special designation for them to go to or benefit the brain.

12.     Defendant Mark Underwood in his various corporate roles and individually, over the years as the head of the Quincy Corporate Defendants, has controlled, directed and been the final

AMENDED CLASS ACTION COMPLAINT

decision maker regarding everything about Prevagen, including deciding and directing that the pre-injunction brain health benefits and "clinically tested" representations be prominently displayed on the front of the Prevagen bottles and approving that the Prevagen products be sold nationwide, that a nationwide television advertising saturate the airwaves including in California, with the intent and purpose that California consumers such as Plaintiff as well consumers around the nation would see, be exposed to and rely on the above described brain health representations to induce Plaintiff and the Class members to purchase Prevagen.

13.    In this regard, Defendant Underwood knew and expressly aimed and directed the above mentioned brain health representations at consumers such as Plaintiff and the class she seeks to represent, causing Plaintiff and the class financial injuries.

14.    As such Defendant Underwood approved the sale of Prevagen in California, including the introduction of Prevagen products/boxes into the state of California where California consumers would see them on the shelves of brick and mortar stores and elsewhere (such as on television ads, on Defendants' web site and on online sellers including but not limited to Amazon, CVS, Walmart and others) so that Calffiornia consumers could and would see and rely on the "pre-injunction brain health benefit representations.

15.    Defendant Underwood also directed and caused the Quincy Corporate Defendants to purchase and arrange for the nationwide broadcast, including in California, television ads promoting Prevagen brain health benefits knowing that such ads would be broadcast in California in order to induce residents of California to rely on the representations in the commercials about Prevagen Brain health benefits and purchase the product.

16.    Defendant Underwood also directed and caused the Quincy Corporate Defendants to establish a web site that prominently displays the front of the Prevagen labels as well as making statement consistent with the brain health representations with the knowledge and intent that other California consumers would view the brain health representations on the label and elsewhere on the website in making their decisions to purchase Prevagen.

17.    In this regard, Defendant Underwood testified under oath during the recent New York Attorney General's trial that he controlled and controls virtually every aspect of the Quincy Corporate

Defendants' business, including for purposes of this matter, the marketing and sale of Prevagen nationwide and as a result he was and is the final decision maker who decided to market and sell Prevagern in California  including directing the false and misleading brain health representations as well as the false and misleading clinically tested representations.

18.     In this regard, from as early as 2012 when he signed and authorized a GRAS ("Generally Regarded as Safe") submission to the FDA which, as more fully discussed below, admited facts that conclusively demonstrate that Prevagen cannot work as represented Defendant Underwood knew, at least as of that date, that Prevagen could not work as he represented to Plaintiff, California consumers and consumers throughout the nation.

19.     In this regard, Defendant Underwood testified that not only is he part of the marketing and creative team for the Prevagen products but that he has direct oversight "over every department from finance to research and development to sales and marketing."  Tr. Trans. P. 128 (Exhibit 1(a)).  This includes the decision to market and sell Prevagen nationwide as well as in California primarily through the false and misleading representations on the front of the Prevagen labels which were also prominently displayed on the website and in the TV commercials.

20.     In this regard, Defendant Underwood testified that he is:

The cofounder, president and chief operating officer of all of the different defendant companies, all of which are under the same umbrella company, all of which have the same CEO and all of which have the same set of officers.

Tr. Trans. P. 130 (Exhibit 1 (b)).

21.     Defendant Underwood testified that the head of marketing reports directly to him. Tr. Trans. Pp. 139-141 (Exhibit 1 (c)).

22.     In these capacities, Defendant Underwood directed and caused the above referenced "pre-injunction brain health benefit representations" to be prominently displayed on the Prevagen labels as well as in television ads and on the Prevagen web site in form of a large picture of the front of the Prevagen labeling being the first thing that any consumer saw upon arriving at the Prevagen web site, such that any consumer who saw a Prevagen television ad or purchased Prevagen online would first see the "pre-injunction brain health representations."

23.     Thus, every consumer who purchased Prevagen during the period when the "pre-

injunction brain health benefits" were being used, including Plaintiff, would have seen and been exposed to the front of the label these brain health prior to their making their decision to buy Prevagen.

24. Defendant Underwood controlled and directed all of the Prevagen marketing messages and intended that others, such as Plaintiff and the class she seeks to represent, read and rely upon the "pre-injunction brain health benefit representations" on the Prevagen labeling in making their purchase decisions – be it viewing the labeling itself such as Plaintiff did both in television ads and on the shelves of the brick and mortar store where she made her purchase, viewing the label on the Prevagen web site or in television ads all for the sole purpose of influencing and inducing them into purchasing Prevagen.

25. And logic dictates this to be the case, as there would be no other reason for consumers such as Plaintiff and the class she seeks to represent to buy a product containing a previously obscure dietary protein – apoaequorin – other than the above-mentioned brain health benefits – and Mr. Underwood knew and understood this to be the case. As such he orchestrated, directed and implemented the marketing/advertising plan to tout Prevagen's brain health representations prominently on the front of the product label and knew and intended that this would be the first thing a consumer would see when viewing the Prevagen on the label, website or TV commercials.

26. Defendant Underwood, in directing and causing the Prevagen product to be placed in commerce in California knew and intended that consumers such as Plaintiff and the class she seeks to represent would read and rely upon the "pre-injunction brain health representations" when making their purchases.

27. Mr. Underwood, in his individual and corporate capacity, has testified that the Quincy corporate Defendants collectively have marketed the Prevagen products on a nationwide basis which necessarily includes California. Tr. Tran. Pp. 139-141. (Exhibit 1(c)).

28. During both the pre-injuntion period Defendant Underwood and the Quincy corporate defendants engaged in a widespread nationwide marketing campaigns over the television networks – in fact, it was hard to avoid seeing a television ad for Prevagen when you watched any of the major cable networks.

29. The television ads convey the same messages as those made on the front of the Prevagen labeling, with mostly older people or Pharmacists endorsing the product in the advertisements.

AMENDED CLASS ACTION COMPLAINT

30.     For instance, one of the pre-injunction ads is about a person named "Douglas" who was paid to make his testimonial and who claimed that he was over 65 and from Chicago, Illinois. In the ad he claims that he is surrounded by younger people in his work as a writer. He then states that he "had to get help somewhere along the line to stay competitive" and "I started taking Prevagen and over time my memory improved – it was a game changer for me."[3]

31.     The sole active ingredient that is represented by Defendants as providing these brain health benefits is a synthetically made dietary protein called apoaequorin.

32.     In its natural state, apoaequorin is found in certain jellyfish and is the matter that causes these jellyfish to illuminate.

33.     The Synthetic apoaequorin manufactured and sold by Defendants does not illuminate.

34.     Knowing full well that Prevagen does not and cannot provide brain health benefits, and as noted below, having admitted as such to the FDA in 2016, Defendant Underwood and the Quincy Corporate Defendants through their uniform marketing messages on the Prevagen labeling, on television and on their website induced consumers albeit mostly elderly persons – and many on fixed incomes - to pay up to $60 or more a month for a product that is worthless.

**Defendants' Search for an Angle to Market Inexpensively Made Synthetic Apoaequorin**.

35.     The purported connection between Defendants' synthetic apoaequorin and brain health is the byproduct of a scientific misnomer that came to its creator, Defendant Mark Underwood, in what he claims was an epiphany.

36.     In fact, how Underwood and Quincy arrived at apoaequorin as a supplement that purportedly provides brain health benefits is a tortured tale that itself demonstrates that Underwood and Quincy merely searched for a use of cheaply made synthetic apoaequorin so that they could make millions off of unsuspecting consumers.

37.      Defendant Underwood authored a book in 2007 entitled "Gift From the Sea" in which he details how he supposedly "discovered" apoaequorin's purported brain health benefits.

38.      The story told by Underwood purports to start when, as an undergrad at the University of Wisconsin Milwaukee, he somehow became intrigued with whether apoaequorin "might protect brain

---

[3] *See, e.g.*, https://www.youtube.com/watch?v=-MNWQGbXA2A.

AMENDED CLASS ACTION COMPLAINT

1    cells and through that process, guard against neurodegenerative conditions like Alzheimer's, Parkinson's

2    and stroke." Mark Y. Underwood, *Gift From the Sea* (AuthorHouse 2007), attached as Exhibit 2 (a).

3        39.    Thus, Underwood writes that he began recording copious notes about his "vision" of

4    "using jellyfish protein to slow down memory loss and aging, an idea that seemed too good to be true…."

5    *Id.* And it was – for Underwood and his co-Defendants but not for consumers.

6        40.    According to Underwood, "I took that interest to the next level after reading a case study[4]

7    about a patient who contracted the symptoms of Guillain Barre' Syndrome after a jellyfish sting, and

8    was successfully treated with calcium channel blockers." Underwood, attached as Exhibit 2 (b).[5]

9        41.    According to Underwood it was less significant to him that the person's Guillain Barre'

10   symptoms improved to "some extent" because what "fascinated" him was that "jellyfish could inflict

11   this problem, yet not suffer from it within its own simple nervous system." *Id.* [6]

12       42.    From this he supposedly had many questions: (1) "What is calcium's role in damaging

13   the nervous system?" (2) Can mediating calcium fight neurological conditions? (3) How can jellyfish

14   deliver a sting and not suffer any neuropathy? [and most important] (4) "Why doesn't a jellyfish poison

15   itself?" Underwood, attached as Exhibits 2(b) and 2(c).

16       43.    Intriguing questions – but reflecting a lack of basic knowledge such as that: (1) Calcium's

17   role and its levels, at least in the brain, are tightly controlled (e.g. mediated) by the brain itself to help

18   maintain the nervous system – as too much calcium can be just as bad as too little.

19       44.    What connection any of Underwood's opinions had to apoaequorin is opaque at best and

20   actually pure fantasy as far as the real science is concerned.

21       45.    For instance, his logic about the benefits of supplemental calcium-binding proteins was

22   as simplistic as it was wrong. As Underwood saw it, "after all, it had long been documented in the

---

[4]  Even though this case study had nothing to do with brain health, it should be noted that case studies about a single individual is a type of clinical evidence that cannot be relied upon to reach any conclusions about the efficacy of the substance being tested – e.g. in this case channel blockers to treat a jellyfish sting. *See* Patricia B. Burns et al., *The Levels of Evidence and their Role in Evidence Based Medicine*, 128 Plast. Reconstr. Surg. 305, 305-310 (2011), attached as Exhibit 3.

[5]  Calcium channel blockers are used to lower blood pressure by preventing calcium from entering the cells of the heart and arteries – they have nothing to do with brain health. *Calcium Channel Blockers*, Mayo Clinic (Aug. 23, 2023), attached as Exhibit 4.

[6]  Of course, there is nothing unique or fascinating about this, as numerous venomous animals, plants and the like do not suffer from their own poisons.

9

medical community that the depletion of calcium-binding proteins was associated with aging and the onset of neurological diseases. Why not just add these valuable proteins back into the body [via apoaequorin]. Exhibit 2 (d).

46.     But again, it needs to be repeated – the brain tightly controls the levels of calcium because too much can be as bad as too little. So even if Prevagen did add these "valuable proteins" into the body, which it does not, more is not better when it comes to calcium and the brain.

47.     Nevertheless, Underwood relates yet another most convenient event - Underwood met a molecular biologist during a volleyball game and mentioned that he was interested in studying jellyfish proteins and low and behold this person said he too was intrigued with apoaequorin and better yet he knew how to make it in a lab.  Underwood, attached as Exhibit 2 (e).

48.     As Underwood exclaimed in his book, "What were the odds that I would meet, during a volleyball game, one of the few people in the world who knows how to make this remarkable protein?" *Id.*

49.     Of course, there is nothing remarkable about how synthetic apoaequorin is made – as set forth in Quincy's GRAS (Generally Regarded as Safe) document submitted to the FDA in 2016, in response to a warning letter issued by the FDA to Defendants, synthetic apoaequorin is "a standardized protein preparation produced by microorganism recombinant technology"- a technology that has been used since the 1970s to produce various recombinant proteins.

50.     But there was even more serendipity to Underwood's fishy tale. Underwood writes that he then met with a Mr. Beaman, who as it just turned out, was interested in diversifying his investments so: "That day we sketched out a business plan on a lunch napkin for a new company called Quincy Bioscience. Our goal? To take this jellyfish protein and create a *drug* to help fight Alzheimer's disease and other related neurodegenerative conditions." Underwood, attached as Exhibit 2 (f)(emphasis added).

51.     And that's how Underwood and the Quincy Defendants first marketed Prevagen – not as a dietary supplement to help support brain health and function – but as a *drug* to treat diseases like Alzheimer's and other similar conditions.

52.     Apparently, Underwood as the head of Quincy and its chief promoter at the time – appearing on podcasts and radio promoting it to treat diseases, did not know or care that the FDA

AMENDED CLASS ACTION COMPLAINT

considers claims about Alzheimer's and other dementias to be disease claims, requiring that the claims they were making about Prevagen be subject to the FDA's new drug approval process ("NDA").

53.    But they learned later on when, as discussed below, the FDA issued Quincy a warning letter in 2012 about its marketing Prevagen as a drug without prior FDA approval.

54.    Admittedly, the human brain's neurons (the cells in our brains that govern its functions) do require calcium-binding proteins to perform their functions.

55.    But, as opposed to Underwood's unscientific notions of the brain and its health as reflected in his book and in Defendants' marketing and sale of Prevagen, the brain does not need nor would it accept help from the outside, such as synthetic apoaequorin, as the brain endogenously makes its own calcium-binding proteins.

56.    In fact, apoaequorin is not one of the calcium-binding proteins that are made by the brain, so it's hard to fathom, how apoaequorin would be used by the human brain even if it ever got in, particularly since after millions of years of evolution, what the brain needs and what it uses have been carefully developed through evolution and, as a result, what gets into the brain is tightly regulated and controlled by something called the blood-brain-barrier ("BBB").

57.    It is true that, as we age, like everything else in our bodies, the brain's ability to make calcium-binding proteins slows down.

58.    But this does not mean that, as a result, the brain requires more calcium-binding proteins from outside the brain.

59.    That is because, the regulation of the levels of calcium-binding proteins and thus calcium in the brain is tightly and continuously controlled by the brain itself to maintain proper levels as needed in its various areas - as sometimes areas in the brain require more calcium but at other times they require less calcium.

60.    In this sense, calcium is not a more-is-better substance when it comes to the brain and any purported interference from the outside, such as the introduction of apoaequorin into the brain in any material amount would pose a risk of upsetting that balance, and since it would be foreign to the brain, could likely cause an immune response/reaction in the brain that could be deleterious.

61.    And as discussed below, that is one of the many reasons why if a molecule of intact

AMENDED CLASS ACTION COMPLAINT

apoaequorin survived digestion (which as set forth below is not possible) and arrived at the brain, it would not be allowed to enter.

62.    Yet, the sole scientific premise upon which Defendants have built their claims that Prevagen provides its supposed brain health benefits is that Prevagen supposedly provides more calcium-binding proteins to the brain. In fact, in the 2016 published version of a highly flawed clinical study called the Madison Memory Study ("MMS") Underwood and his co-authors asserted – without any reliable scientific support - that apoaequorin works by regulating the levels of calcium in the brain. Daniel L. Moran, Mark Y. Underwood, Taylor A. Gabourie & Kenneth C. Lerner, *Effects of a Supplement Containing Apoaequorin on Verbal Learning in Older Adults in the Community*, 30 Advances in Mind-Body Medicine 1 (2016), attached as Exhibit 6.

63.    Moreover, as will be seen below, Underwood and Quincy's crude and unscientific illlogic about why Prevagen and its so-called unique calcium-binding protein might work, ignores such things as that: (a) once Prevagen hits the stomach it is no longer a calcium-binding protein, as it is protilized by the first of a torrent of enzymes in the stomach and then is assaulted in the intestines by a battalion of digestive enzymes such that by the end of the digestion process, it is completely digested/hydrolyzed into common amino acids like all other dietary proteins (b) even then the amount of calcium that would be bound by an undigested 10 mg dose of Prevagen is negligible (about 10,000 times less than our daily requirements) and (d) if for some reason a molecule of apoaequorin survived digestion and somehow arrived outside the brain, it would be prevented from entering the brain because the BBB blocks molecules with masses over 0.4-06 kilodaltons or that are hydrophilic (soluble in water) – and apoaequorin has a mass of approximately 22 kilodaltons as well as being highly soluble in water. So Prevagen's apoaequorin just cannot enter nor affect the brain in the manner that Defendants represent.

64.    In fact, the BBB and its impermeability is one of the primary reasons why treatments for such ailments as brain cancer or Alzheimer's have failed and scientists have been struggling for decades searching for the means of getting these treatments – drugs that might actually work - to the brain for the treatment of diseases.

### The FDA Steps In and Issues Warning Letters

65.    But the actual science did not deter Defendants. At the beginning of the promotion of

AMENDED CLASS ACTION COMPLAINT

Prevagen, starting in 2007, Mr. Underwood and Quincy made a series of outlandish claims about Prevagen that involved its treating dementia, Parkinsons, and other neurological conditions.

66.     These claims were made without an iota of clinical research on Prevagen and its purported treatment of human diseases, and instead were claimed by Underwood and others promoting Prevagen based upon the speculative claim that apoaequorin regulated calcium levels in the human brain.

67.     As noted above, such claims were actually illegal disease claims that amounted to Prevagen being sold as a drug without ever gaining drug approval from the FDA. In 2012, the FDA caught up with Defendants. And while Plaintiff's claims here are not based upon Defendants' violations of FDA law by selling Prevagen as an unapproved drug, this background provides evidence as to how Prevagen eventually ended up being sold as a dietary supplement, devoid of any reliable scientific support and overwhelming science demonstrating why it could never provide such benefits.

68.     Defendants' illegal marketing of Prevagen, as an unapproved drug, was raised in an October 16, 2012 warning letter from the FDA. *See* Warning Letter from Michael Dutcher, FDA Director, to Mark Underwood, President, Quincy Bioscience Manufacturing Inc. (Oct. 16, 2012), attached as Exhibit 7.

69.     Thus, began a series of communications with the FDA and Defendants discussed in further detail below, which ultimately resulted in the Defendants admitting that once digested, Prevagen is no longer a calcium-binding protein but, instead, is completely digested into common amino acids like other dietary proteins - or to put it in simple terms – Prevagen has no more direct effect on brain health than a very minute piece of baloney or any other dietary protein.

70.     This warning letter process also began Defendants' shifting their marketing claims to Prevagen as a dietary supplement, so they would hopefully avoid FDA's warnings about Defendants making illegal disease claims.

71.     But the fact is that the story of Prevagen has always been about the Defendants and the Quincy Defendants trying to find a claim for a product that costs pennies to make but that could make them millions, while avoiding FDA scrutiny.

72.     And the easiest route was to market Prevagen as a dietary supplement, as the Federal dietary supplement laws do not require a dietary supplement manufacturer to submit the scientific

AMENDED CLASS ACTION COMPLAINT

1   evidence to support their labeling claims, but instead merely requires the supplement manufacturer to

2   submit a letter before they begin selling the product that vouches that they have the required scientific

3   support for their labeling claims.

4   **The False and Deceptive Marketing of Prevagen as a Dietary Supplement**

5       73.    Today, Prevagen is sold in virtually every major food, drug, and mass retail outlet in the

6   country as well as online, where consumers can sign up to receive their Prevagen directly from

7   Defendants even month. *See* https://prevagen.com.

8       74.    If a consumer purchased online during the pre-injunction period, here are just some of the

9   false and misleading claims made on the website's first page:[7]

10          (a) "Prevagen is an over-the-counter supplement for healthy brain function and memory

11              improvement citing to the MMS a wholly unreliable and scientifically unsound study;

12          (b) Prevagen "uniquely supports brain function"

13          (c)  "Prevagen has been clinically shown to safely and effectively improve memory" (again

14              referring to the MMS and attaching an unpublished version of one of the various versions

15              of the MMS study that Defendants drafted over time to support their false marketing

16              claims);

17          (d) It then offers up links to short blurbs containing various individual testimonials about

18              Prevagen and if one then links to their videos, on the bottom left-hand corner, of the

19              video, for a total of 4 seconds of a 90 second video, it states that these are paid endorsers

20              – in short "Paid Testimonialists" for Defendants.

21          (e) And yet again, despite the FDA's warnings, prior to the injunctions when one clicked to

22              a link Defendants provide regarding the purported safety of Prevagen, among the articles

23              cited by Defendants is one that still concerns disease related claims about Prevagen "A

24              brief review of three common supplements used in Alzheimer's Disease"[8]; and (2) one

25

26   [7] https://prevagen.com/ (last visited October 4, 2023) – no longer available due Defendants removal of
     references to these web pages from the internet, including the Wayback Machine.

27   [8] Although not a basis upon which Plaintiff relies to support her consumer fraud claims this is a direct
     violation of FDA's proscription that supplement manufacturers cannot and should not refer to articles

28   discussing the treatment of diseases in reference to their products. See section 403®(1)(B) and section

AMENDED CLASS ACTION COMPLAINT

involves a study in rats (an albeit horribly conducted study) that deals with whether Prevagen protects brain cells from injury in a simulated ischemic stroke.

75. And, pre-injunction, if one clicked on the "shop" link one sees pictures of the front labels of each Prevagen product[9] – all of which make the same uniform representations (summarized herein) on their front panels (the only differences between these products is their dosing and whether one chooses capsules or chewables). A screenshot of the labeling of each Prevagen product that is a focus of this case is set forth below. As is readily seen, other than differences in dosing,[10] the labeling claims made on every Prevagen product make the same false and deceptive claims about Prevagen.

76. The label panels set forth below are representative of any and all labels used during the class period, including the post-injunction labeling, as the unifying message throughout all of the Prevaen labeling was and still is that Prevagen will benefit one's brain when it does not:




---

101.14(a)(1) "[i]mplied health claims include those statements, symbols, vignettes, or other forms of communication that suggest, within the context in which they are presented, that a relationship exists between the presence or level of a substance in the food and a disease or health-related condition." P. 24; p. 28 where FDA uses an example of a supplement manufacturer of vitamin E citing to an article whose title indicates that vitamin E might be effective against heart disease;

[9] Only two are not part of this case – Prevagen Professional and Prevagen NeuroShake.

[10] The "extra strength" dose is double the "dose" of apoaequorin in the regular strength products but, as alleged above, doubling the dose of apoaequorin does not improve the strength of the extra strength products as Prevagen, at any dose sold is worthless and incapable of providing any of the brain health benefits Defendants represent.













16

AMENDED CLASS ACTION COMPLAINT

























**Supplement Facts**

Serving Size: 1 tablet

| Amount per tablet | | % Daily Value |
|---|---|---|
| Total Carbohydrate | 1 g | <1%** |
| Vitamin D (as D3 cholecalciferol) | 50 mcg | 250% |
| Apoaequorin | 10 mg | † |

** Percent Daily Values are based on a 2,000 calorie diet.
† Daily Value not established.

**Other ingredients:** Sorbitol, mannitol, natural flavors, contains 2% or less of: annatto extract (for color), casein peptones, lactose, magnesium stearate (vegetable source), maltodextrin, modified corn starch, organic agave inulin, organic rebaudioside A (stevia extract), salt, soy peptones, stearic acid, sugar.
**Contains:** Milk and Soy
Contains a bioengineered food ingredient.
**Distributed by:** Quincy Bioscience Holding Company, Inc., Madison, WI 53711, USA
**Suggested use:** Take one tablet daily in the morning, with or without food.







**Supplement Facts**

Serving Size: 1 tablet

| Amount per tablet | | % Daily Value |
|---|---|---|
| Total Carbohydrate | 1 g | <1%** |
| Vitamin D (as D3 cholecalciferol) | 50 mcg | 250% |
| Apoaequorin | 20 mg | † |

** Percent Daily Values are based on a 2,000 calorie diet.
† Daily Value not established.

**Other ingredients:** Sorbitol, mannitol, natural flavors, contains 2% or less of: beet juice powder (for color), casein peptones, citric acid, lactose, magnesium stearate (vegetable source), maltodextrin, modified corn starch, organic agave inulin, organic rebaudioside A (stevia extract), salt, soy peptones, stearic acid, sugar.
**Contains:** Milk and Soy
Contains a bioengineered food ingredient.
**Distributed by:** Quincy Bioscience Holding Company, Inc., Madison, WI 53711, USA
**Suggested use:** Take one tablet daily in the morning, with or without food.













AMENDED CLASS ACTION COMPLAINT

77.    And pre-injunction if one clicked on a product label on the website, one would see identical labeling panels with the only difference being that the extra strength doses are claimed to be "designed to have twice the apoaequorin as Prevagen regular strength" - no other statements as to how the extra dosing might provide more or different benefits.[11]

78.    One of the side panels on the Prevagen pre-injunction boxes stated: "PREVAGEN – Healthier Brain. Better Life" which is followed underneath by "Safe and Clinically Tested Ingredient … Prevagen is formulated with apoaequorin, which uniquely supports brain function. In a computer-assessed, double-blinded, placebo-controlled clinical study, Prevagen improved certain aspects of cognitive functions over a 90 day period." After this statement there is an "asterisk" and if perchance a consumer looks for that asterisk elsewhere on the product labeling (though that they would is not likely) they will find another asterisk on another side-panel apparently linked to the first asterisk, and there language supposedly qualifying the 90 day representation quoted above states: "Based upon a clinical study of a subgroup of individuals were cognitively normal or mildly impaired."  Yet, for the reasons set forth herein, this statement too is false, misleading or deceptive given that this supposed "qualifying statement" refers to the MMS post hoc subgroup analysis that is entirely improper, scientifically invalid for purposes of relying on it to reach efficacy conclusions and which the jury in the state of New York's action found did not support the labeling claims and were either deceptive or misleading.

79.    And this same message is conveyed on a page that contains this link.[12]

80.    These messages were all on the pre-inunction Prevagen packaging.

81.     As the above illustrates, Prevagen is available in regular strength, extra strength, and mixed berry flavor chewable forms. The regular strength and mixed berry flavor products contain 10 mg of apoaequorin per serving, while the extra strength products contain 20 mg of apoaequorin per serving. A 30-count bottle of 10mg doses of Prevagen retails for $39.95 (a 60-count bottle sells for $74.95) and extra-strength sells for $59.95 for a 30-count bottle (and $109.95 for a 60-count bottle).

82.    While Defendants have routinely changed the physical makeup of the boxes and bottles

---

[11]    https://prevagen.com/products/prevagen-regular-strength-brain-health-memory-supplements    (last visited October 4, 2023).

[12]    https://prevagen.com/products/prevagen-regular-strength-brain-health-memory-supplements    (last visited October 4, 2023 (currently this link is inoperative and not available on the Wayback Machine as well.

AMENDED CLASS ACTION COMPLAINT

1    over time, the same brain health messages have always been conveyed as the ones discussed above.[13]

2    83.    And throughout the relevant time period (class period), Defendants have consistently

3    conveyed the same message to consumers throughout the United States during the pre-injunction period,

4    including California, that Prevagen will "improve[] memory" and "support[]: healthy brain function,

5    sharper mind, and clearer thinking" simply by taking a recommended daily dosage.

6    84.    Defendant's pre-injunction brain health representations are false, misleading or deceptive

7    as they convey that Prevagen will provide a benefit to one's brain.

8    85.    Moreover, each and every consumer who purchased these Products after viewing the

9    labeling – which they must in order to purchase it -¯ be it physically viewing on a actual bottle or box,

10   viewing it in a tv ad or online, is exposed to and necessarily relied upon the deceptive brain health

11   representations, which appear prominently and conspicuously on the front of each Prevagen label as

12   discussed above.

13   86.    Each Prevagen product is essentially the same, as each contains the same active

14   ingredient, apoaequorin, and as set forth herein, whether the product contains 10mg or 20 mg of

15   apoaequorin makes no difference because the apoaequorin contained in each is worthless for the same

16   reasons – once ingested, apoaequorin, in either capsule, chewable form or any form Defendants might

17   choose, is completely digested into an extremely small and immaterial amount of common amino acids

18   and in this sense is no different from any other dietary protein.

19   87.    And if, for some reason, some completely intact molecules of apoaequorin survived the

20   enzymatic onslaught that happens during digestion – which even Defendants admitted was not possible

21   in their GRAS filing before the FDA in 2016 – and even if some of these molecules did not get snatched

22   up by the over trillion cells in our bodies and somehow ended up near the brain, they would not be able

23   to gain entry into the brain because the blood brain barrier ("BBB") would block their entry.

24   88.    Thus, the most compelling reason why Prevagen cannot do what Defendants claim it does

25   is found in well-accepted body chemistry science - apoaequorin, a dietary protein, is digested into

26

27   _____

28   [13] Earlier versions said "clinically shown" but as part of a Florida based claims made settlement that paid the class approximately $900,000.00 and the lawyers approximately $2,500,000.00, Defendants agreed to a meaningless change in the wording to "clinically tested." The class here does not include any of the purchases that were subject to this prior class settlement.

common amino acids just like most other - non-allergenic- dietary proteins and can make no more contribution to brain health than a piece of baloney, turkey or hamburger – and extremely small pieces at that.

89.    Once digested, apoaequorin is no longer apoaequorin, is not a calcium-binding protein (the feature that was the reason that Underwood claimed apoaequorin works to provide brain health benefits), and instead becomes a miniscule amount of generic amino acids. As a result, it is incapable of providing the purported brain health, function, and memory benefits.

**In 2016, Defendants Admitted to the FDA that Prevagen is Completely Digested into Amino Acids Like other Dietary Proteins – Or in Other Words – Prevagen Cannot Work as Represented[14]**

90.    In another warning letter sent on November 21, 2013, the FDA noted that since the apoaequorin sold as Prevagen was synthetically made it was not a recognized food that humans had eaten on a large scale basis – precluding it from being sold as a dietary supplement.

91.    The primary issue raised by the FDA in this regard was whether, given that synthetically made apoaequorin had never been ingested as a food by humans, was it allergenic.

92.    In response to this letter, Defendant Underwood and the Quincy Corporate Defendants engaged experts to (1) conduct various commonly relied upon digestion studies of Prevagen and (2) interpret the results of these studies as well as other scientific evidence to determine whether apoaequorin was allergenic.

93.    The results of these digestion studies were presented to the FDA by Defendant

---

[14] While the FDA has not taken direct action against the Defendants and closed it files in 2018, in 2017 the FTC filed a injunctive action that was first tried by the State of New York to a jury that rendered a verdict finding, among other things, that all of the pre-injunction brain health representations had a tendency to deceive and that two of them, "Prevagen reduces memory problems associated with aging" and "Prevagen is clinically shown to reduce memory problems associated with aging" were materially misleading.  *FTC et al. v. Quincy Bioscience et al.*, No. 1:17-cv-00124-LLS (S.D.N.Y.). Since private plaintiffs cannot bring injunctive relief claims for consumer fraud claims (*See Conrad v. Boiron*, 869 F.3d 536, 542 (7th Cir. 2017) the claims asserted herein do not overlap those of the FTC case which, in turn, is precluded from seeking monetary relief (See, *AMG Capital Management, LLC v. Federal Trade Commission*, 141 S. Ct. 1341 (2017). The State of New York claim for damages on behalf of New York residents was denied by the District Court. Subsequent to the jury trial, the District Court entered a nationwide injunction against Defendants enjoining them from making all of the pre-injunction brain health representations finding that it saw "no merit in allowing that deceptive conduct to continue."  ECF no. 553.

Underwood and the Quincy Corporate Defendants in an August 2014 letter.

94.    This document – called a GRAS letter (Generally Accepted As Safe) was submitted to the FDA and was signed and approved by the President of Quincy Bioscience LLC, Defendant Mark Underwood.

95.    The report from the experts engaged by Defendants contained in this GRAS letter opined that synthetic apoaequorin is no more allergenic than other non-allergenic dietary proteins and similar to other common dietary proteins because Apoaequorin is "digested or hydrolyzed to individual amino acids and then absorbed in the digestive tract."

96.    Their studies also suggested that the digestion characteristics of Apoaequorin were similar to those of common non-allergenic dietary proteins.

97.    Simply stated, the above statements provided to the FDA by Underwood and the Quincy in their effort to convince the FDA that apoaequorin is not allergenic, asserted that apoaequorin is not allergenic because it is completely digested and, in turn, this document submitted by Quincy and Defendant Underwood constitute admissions on Defendants' part that Prevagen cannot and does not work as they represent, as if apoaequorin is completely digested into common amino acids it cannot work as represented any better than any other common dietary protein.

98.    Defendant Underwood recently testified during the New York Attorney General's trial that the statements made in the GRAS letter were "truthful." Tr. Trans. Pp. 148-50 (Exhibit 2 (f)).

99.    Moreover, the number of amino acids derived from one dose of 10mg or 20mg Prevagen is trivial in terms of any other nutritional benefits let alone brain health benefits.

100.    Our daily protein intake is approximately 75,000mg, yet the amount of amino acids produced by the digestion of a Prevagen 10 mg dose is about 1/7500 or about 0.013% (0.025% for a 20mg dose) of the average intake of dietary intake of proteins.

101.    Yet, a 10mg dose of Prevagen costs over $1.00, making Prevagen a grossly overpriced dietary protein.

102.    By way of comparison a hot dog wiener which costs about $.50 - $.75 contains about 5000mg of protein or 500 times the protein of a Prevagen 10mg dose – even a piece of white bread contains over 200 times the amount of protein than a 10mg dose of Prevagen.

103.    At $.50 per hot dog, 10mg of hot dog would cost approximately $0.001 per mg or $0.01 per 10 mg, whereas 10 mg of Prevagen costs approximately $1.33.

104.    Moreover, if it's apoaequorin's ability to supply calcium-binding proteins to the brain, Defendant's 2016 GRAS letter to the FDA put that lie to rest as they admitted that (1) the amount of calcium bound by Prevagen at either 10 or 20mg doses "will be very small (negligible)" and (2) after calculating the amounts of calcium bound by Prevagen the letter states, "the daily recommended allowance of calcium is 1200mg and is over 10,000 fold higher" (Id.) which makes the calcium-binding potential of a dose of Prevagen beyond trivial.

105.    But, if one is to believe Defendants and as Mr. Underwood as set forth in his book discussed above, the whole reason for the "invention" of Prevagen was that apoaequorin is a calcium-binding protein and that our brains could use more calcium-binding proteins as we age.

**The Blood-Brain Barrier Would Block Any Intact Apoaequorin That Reaches the Brain**

106.    Moreover, even if somehow some intact apoaequorin molecules did survive digestion, if they did not cause anaphylactic shock like undigested peanut molecules (e.g. why Defenedants had experts submit a report to the FDA that apoaequorin is completely digested before it hits the bloodstream), those molecules would more than likely be snatched up by any of the approximate trillion cells in our bodies before they reached the brain.

107.    And as noted above – the BBB blocks molecules like apoaequorin.

108.    Plaintiff and her counsel have retained one of the world's foremost experts in brain chemistry/health and an expert in the field regarding whether and how substances may or may not affect brain function and memory.

109.    He has evaluated the ingredients in Prevagen, along with reviewing the various iterations of the MMS study.

110.    Plaintiff's expert has concluded that (1) Prevagen cannot work as represented because the apoaequorin, the only purported active ingredient in Prevagen, once ingested, is completely destroyed by the digestive system, transforming it into common amino acids (and maybe a few small peptides – combinations of two amino acids) no different than those derived from other common food products such as chicken, cold cuts, hamburgers etc., (2) the average diet contains 50-100 grams of protein per

day, contains all the required amino acids, and provides about 50,000-100,000 times more amino acids than Prevagen and , as a result, any amino acids derived from the digestion of Prevagen would be massively diluted and could have no measurable effect on the brain, (3) ingestion of Prevagen cannot and does not have any effect on brain function or memory (4) the Madison Memory Study is deeply flawed because, among other things, the post-hoc subgroup conclusions relied upon by Defendants violated established clinical trial principles as well as not being supported by the study and (5) if it is to be relied upon for anything it proves that Prevagen does not work as represented because the original endpoint – whether Prevagen provided any brain health benefits – was shown to be negative in that Prevagen was no better than placebo.

111.    As a result, Defendant's citation to this subgroup analysis in its marketing as described herein, leading consumers to believe that Prevagen's has been proven to work as represented, is a separate false, misleading, and deceptive statement that is in addition to the false claims made by Defendants that Prevagen provides any sort of brain health benefits.

### "Clinically Tested" Conveys the Message that Prevagen is Clinically Shown/Proven To Provide the Represented Brain Health Benefits

112.    Throughout the pre-injunction period[15] Prevagen packaging and other marketing Defendants make numerous references to the MMS and the fact that Prevagen has been proven effective for slowing down mild cognitive decline or even improving cognitive performance in those with mild cognitive decline.

113.    Though not disclosed to consumers, this claim, in turn, was based on an unplanned post-hoc subgroup analysis of the MMS. This, of course, is a convenient subgroup finding for Defendants to promote Prevagen, as they comprise most people who are concerned with memory issues.

114.    The pre-injunction Prevagen front label packaging stated that the Product was "clinically tested" to provide brain function and memory benefits. By stating that the product was clinically tested, Defendants were representing to consumers that credible scientific evidence existed which supported Defendant's claim that the product provided brain function and memory benefits. Otherwise, why make a "clinically tested" claim in the first instance?

---

[15] The precise dates of the pre-injunction period will be determined during discovery and is itself a question of fact.

115.    Reasonable consumers understand "clinically tested" to mean that there is competent and reliable scientific support for the brain function and memory benefit representations as there could be only two relevant outcomes of clinical testing – either Prevagen was shown to work as represented or not, and reasonable consumers would not conclude that Defendants intended to inform them that the clinical testing proved that Prevagen did not work.

116.    Thus, reasonable consumers would conclude that the fact that Defendants represented that Prevagen was clinically tested meant that the testing showed positive results and that Prevagen would provide the represented brain health benefits.

**The MMS Is A Deeply Flawed Study as is the Subgroup Analysis Cited By Defendants In their Marketing Materials**

117.    The Madison Memory Study ("MMS") and the various differing written reports issued by Defendants over the years about it, are not the by-product of a legitimate clinical study or accepted scientific analysis.

118.    Its results are so flawed as to be wholly unreliable to reach any conclusions about the efficacy of apoaequorin. A jury has rejected Defendants' contentions that the MMS proved that Prevagen works as represented and, in fact, if the study is to be relied upon at all, its results show that apoaequorin does not work as represented.

119.    For at least the last 70 years, the universally accepted form of scientific evidence recognized by experts in the field for determining whether a substance provides any human health benefits is through demonstrating that it has a statistically significant value over placebo based high quality and well-conducted randomized controlled clinical trials ("RCTs").

120.    The MMS is none of the above.

121.    Experts in the field of brain health research would require that any brain health benefits claimed for substances like Prevagen be proven by at least one and, under the well-accepted scientific "principle of replication",[16] most often, two well-conducted randomized controlled clinical trials.

122.    This well-settled science, in turn, requires that any conclusions derived from an RCT

---

[16] The scientific principal that many are taught in high school biology, that before reaching conclusions, an experiment's results should be replicated.

AMENDED CLASS ACTION COMPLAINT

must be ones based upon the testing of pre-planned hypotheses set forth in a protocol prepared before the study.

123.    Since 2005 in order to gain publication in the major or more reputable peer-reviewed journals clinical trials needed to be registered with Clinicaltrials.gov. and such registration meant that a clinical trial's protocol – what it intended to test or study- was made public and thus transparent.

124.    The Madison Memory Study was never registered with Clinicaltrials.gov and as a result it only gained publication in what are known as "pay to play" journals, in that Defendants paid the journal to gain its publication.

125.    Moreover, as discussed more fully below, there are several written versions of the MMS as Defendants began posting versions of it on their website before they paid a journal to publish its results in 2016.

126.    The protocol of the 2016 version of the MMS report appears to set forth the hypothesis it was testing was whether, when the results from the whole group of 218 study subjects were analyzed as a whole, was there a statistically significant difference between the Prevagen group and the placebo-control group over a variety of endpoints.

127.    What is also clear is that the protocol did not specify – on an a priori basis - that any subgroup analyses would be performed on those with no or mild cognitive decline. And, as will be discussed below, the subgroup analysis cited by Defendants in their advertising and on their labels was an improper post-hoc analysis of the data that has the common name "data-mining" – looking for a positive result when none were found per the protocol.

128.    While such post-hoc analyses are routinely performed, particularly when a study is negative as was the case with the MMS, they are not to be relied upon for any conclusions to be derived from the study itself but, instead, at most provide new hypotheses to be subsequently tested in later RCTs, but no such subsequent study was conducted by Defendants.  And for good reason as more fully discussed below, as the sub-group results were as if not more flawed than the study as a whole.

129.    But what must be understood is that any efficacy analyses of sub-groups must have been pre-planned in the original protocol of the study and adequately powered to avoid false positive results.

130.    The sub-group analysis cited by Defendants was not pre-planned but instead was part of

28

AMENDED CLASS ACTION COMPLAINT

1  numerous post-hoc analyses of various small subsets of study participants which Defendants performed
2  until they found a subset they liked.

3       131.    And finally, just as important, post-hoc analyses are deemed unreliable for reaching
4  efficacy conclusions because of the risk of data mining – which is what happened here.

5       132.    So, for example, if Defendants really believed that their post-hoc analysis on this
6  subgroup might have had merit, it was incumbent upon them to conduct a high-quality RCT studying
7  whether Prevagen provided brain health benefits to those with no or mild cognitive declines. That they
8  did not do so, says much about the confidence they have in such a subgroup RCT producing any positive
9  results.

10      133.    It should also be noted that earlier written versions of the MMS did not include the sub-
11 group analysis and instead discussed the results of the study as it was pre-planned by its protocol where
12 it was only intended to study the results from the entire study group.

13      134.    Moreover, it appears that Defendants committed a grave investigative error in that a 2009
14 "interim" report on the MMS study indicates that the Defendants "broke the blind" of the study and
15 before the entirety of the pre-planned 218 or so study group's results were in, and that Defendants looked
16 at the results of the first 100 subjects.

17      135.    Breaking the blind before a study's results are completed is a fatal error for purposes of
18 relying on the study as a whole, as it can lead to significant bias in the study results, potentially
19 invalidating the findings by introducing conscious or unconscious influences on data collection and
20 interpretation, ultimately impacting the credibility and reliability of the study as a whole.

21      136.    And while there are exceptions to the above, such studies are extremely large studies that
22 are designed to take place over many years, such as the 10-year long NIH sponsored study on Vitamin
23 E and prostate cancer that involved up to 15,000 study subjects.  In such large studies, an institutional
24 review board that is completely separated from a study's research group are set up and are allowed to
25 break the blind to view the periodic results.  And in this vitamin E study, the review board terminated
26 the study only after a few years because there was a disturbing trend that eventually turned into a
27 statistically significant result showing that those who were taking the vitamin E supplements were
28 developing prostate cancer at a much higher rate than those taking placebo.  As such the institutional

1  review board could not ethically permit the study to continue when the intervention appeared to be

2  harming study subjects.

3      137.   But no such review board existed for the MMS and thus breaking the blind was yet

4  another fatal mistake impacting the validity of the study's ability to prove efficacy.

5      138.   But that does not preclude the conclusion that the even though Defendants did everything

6  they could to bias the MMS study results in favor of efficacy, the results showed that Prevagen was no

7  better than placebo.

8      139.   Moreover, the improper citation and reliance on the subgroup analysis by Defendants

9  should not obscure that the results for the one hypothesis the study did test – how did Prevagen perform

10  when the entire study group is analyzed, resulted in Defendants writing this in their 2016 published

11  version of the MMS - "no statistically significant results were observed over the entire study population."

12  And in the results section, they acknowledged that this was true for every endpoint that they studied –

13  no statistical differences at all.[17]

14      140.   In fact, it was only after the study results showed no efficacy for the original hypothesis

15  that Defendants went on a data-mining excursion and found that there were purported statistically

16  significant results in one subgroup when their results were combined, and which subgroup Defendant

17  contends comprise individuals "with either minimal or no cognitive impairment."

18      141.   Moreover, while the MMS version published in Advances unduly focuses on a few

19  isolated results for one or a few of the numerous testing points – such as reading a shopping list – and

20  either contends that there were positive intra-group trends or that there was a statistically significant

21  difference on one or a few of the numerous testing endpoints, under well-established clinical trial

22  principles these are not results that that can be relied upon to support efficacy claims. This is because

23  "intra-group comparisons" which merely look at the difference in the "changes" within the intervention

24  group from baseline to the end of the study say nothing about whether or those changes are statistically

25

---

26  [17] Quincy paid for the publication of this 2016 version of the MMS in Advances in Mind-Body Medicine, at best, a fringe journal that appears to make money only by authors paying them to publish. Peer-reviewed journals are ranked on their impact (measured by the times that articles published in their journals are cited). The New England Journal of Medicine has a 176.08 impact factor, the JAMA has a 157.3 impact factor, and the British Journal of Medicine is 96.2. The Advances journal impact rating has been as l0w as 0.132 and is currently 0.40.

27

28

AMENDED CLASS ACTION COMPLAINT

significant when compared to the changes from baseline in the placebo group. And here, as discussed below in greater detail, as was the case with the MMS, where a multiplicity of testing endpoints were measured (at least 4 and maybe as many as 30), even if one or a few of these testing endpoints showed statistical differences between the intervention and placebo group, one cannot arrive at efficacy conclusions based upon the results of a few endpoints because it is the comparison of the results as a whole that must be measured for statistical significance – otherwise – as discussed in greater detail below – the usual statistical significance measure of 0.05 must be divided by the number of endpoints to be studied (e.g. if there were two endpoints then statistical significance can only be based upon a 0.025 measure and so on).

142.    And that is because a few positive results among numerous negative ones cannot be relied upon because they may have happened due to chance and not because Prevagen was effective for these few endpoints.

143.    And again, if Defendants desired to test these few positive endpoints among the many negative ones, basic clinical testing doctrine required that they perform a well-designed clinical trial on these few endpoints to determine whether or not the results from the MMS were valid. That Defendants did not do so is a strong indication that they did not believe that these results could be replicated.

144.    And apart from being the by-product of improper data-mining there is another reason why trying to differentiate between different subgroups that are grouped by AD8 status, as was done in the MMS, is improper as well.

145.    Moreover, as discussed below, because the persons tasked by Defendants with conducting the MMS were not qualified to conduct clinical trials, they chose a device to categorize individual study subjects' cognitive status at baseline (the beginning of the study) and at several points during the study (midpoints and the end) called the AD8 – which is considered to be screening device as opposed to a device that accurately assesses a person's cognitive status.

**<u>The AD8 is a Preliminary Screening Device that is to be used to Determine Whether Further, more Definitive Testing, is Required and is Not To Be Used As It Was In The MMS</u>**

146.    Defendants used the AD8 to categorize the study subjects from no cognitive impairment to severe cognitive impairment.

AMENDED CLASS ACTION COMPLAINT

147.    But the AD8 is not to be used for the purposes it was employed by the Defendants in the MMS.

148.    The AD8 is a basic screening tool that was originally designed to be administered by persons such as family members to assess whether they should seek further, more accurate, testing by medical professionals.

149.    So, but for a few exceptions not applicable to the MMS, all the AD8 is to be used for is to determine whether or not more precise diagnostic testing should be conducted on an individual to evaluate their cognitive status.

150.    Thus, the AD8 sets forth 8 levels of cognitive status – with 1 being the healthiest and 8 being the least healthy.

151.    But it is not a diagnostic tool as it has been found to be wrong as much as 50% of the time in terms of where a patient is situated on the cognitive status spectrum.

152.    This means that, as a threshold matter, there is a chance that 50% of the MMS study subjects were placed in the wrong AD8 category, which in turn means that any analysis of the effects of Prevagen on any subgroups are automatically unreliable to arrive at any conclusions regarding Prevagen's efficacy within such subgroups.

153.    Moreover, a recent meta-analysis of the AD8 found that it has "small informational value in confirming MCI (mild cognitive impairment) and dementia but moderate informational value in excluding it." "The Diagnostic Accuracy of the Ascertain Dementia 8 Questionnaire for Detecting Cognitive Impairment." Attached as Exhibit 8. Yet, it was used in the MMS to recruit subjects with MCI and the subgroup analysis (the persons categorized by Defendants as AD02 patients) claimed to include persons with MCI.

154.    This meta-analysis also found that, "The AD8 had greater sensitivity in differentiating normal cognition from MCI or dementia when used in clinics or hospitals than when used in the community." The MMS was conducted on community dwelling older adults.

**The People Who Designed, Conducted and Analyzed the MMS were not Qualified to Conduct an RCT**

155.    The MMS study's problems also include the fact that it was designed, conducted,

1  analyzed and written up by persons with no training, expertise or experience in clinical trials. This in

2  turn likely describes why it was so unscientific and deeply flawed.

3      156.    The person who seems to have been primarily responsible for designing and conducting

4  the various clinical trials on Prevagen[18] including the MMS, was Taylor Gabourie – who had a bachelors

5  degree in psychology while she was with Quincy and conducting this study.

6      157.    According to her LinkedIn page, she is currently a consultant to the Pandemic Fund and

7  previously was the AMR Communications Officer at the World Organization for Animal Health – she

8  lists her title at Quincy as "Statistical Research Coordinator" who according to her was "the *main*

9  resource at any stage of the research process including: being knowledgeable of all protocols,

10  regulations, ethical standards, processes/procedures and individual colleagues [sic] responsibilities."

11  Attached as Exhibit 9.

12      158.    And the person who purportedly supervised her on the MMS study, Kenneth Lerner, was

13  no better. Mr. Lerner states on LinkedIn that his latest degree is an MBA in marketing and who identifies

14  himself on LinkedIn as being the head of "Business development and Intellectual Property Manager" for

15  Quincy Bioscience since 2006 with his prior positions being "Intellectual Property and Technology

16  Transfer Manager" at the University of Wisconsin Milwaukee (1999-2006) and Business and Corporate

17  Development Manager at Ophidian (a pharmaceutical company) (1993-1999). He lists no experience

18  with clinical trials and, in fact, lists his responsibilities at Quincy as "Diplomacy – drug development[19]

19  budget preparation, legal protection, patent applications, trademark law, trademark infringement,

20  international intellectual property, intellectual property law, patent portfolio management and

21  trademarks.' Attached as Exhibit 10.

22      159.    In short, neither of the two persons listed as the chief "investigators" for the MMS had

23  any material experience designing, conducting or evaluating the results of a clinical trial. Two other

24  authors of the 2016 report of MMS are a person who was in charge of the manufacturing of Prevagen

25  and Defendant Mark Underwood who has a B.A. and whose prior work experience before Quincy was

---

[18] There appear to have been numerous others, other than the cognitive study, including ones for the treatment of diseases such as MS.

[19] Drug development being an interesting term as Quincy sells only one thing – a dietary supplement – Prevagen.

AMENDED CLASS ACTION COMPLAINT

working as a "Director of Business Development" at a packaging company.

160.    As a result, the MMS is riddled with critical and fatal flaws as described herein and should not and cannot have been relied upon by Defendants to claim that it support their brain health representations.

## Per its Protocol The MMS was a Negative Study

161.    What should not be missed is that the MMS study was a negative study as far as Prevagen working as Defendants represent.

162.    Every clinical trial has a pre-stated protocol that sets forth what hypothesis is being studied and then governs how that it is to be studied and what conclusions can be drawn from its results. MMS protocol as stated in the 2016 published version that its purpose was to test the effect of Prevagen on the entire 218 person study group, without regard to their purported cognitive status based upon the AD8.

163.    And, when looking at the results of the entire study group as was originally planned in the protocol, Quincy admitted in its published 2016 version of the study that no statistically significant results were observed over the entire study populations. In short, no statistically significant results were observed in the treatment group over the entire study population on any of nine cognitive tasks.

164.    That should have been the end of the inquiry and the analysis of the data from the MMS – Prevagen did not work for the study group as set forth in the protocol.

165.    Or to put it simply – the MMS study was a negative study that showed that Prevagen does not work as represented.

## Defendants Engaged In and Then Relied On Improper Post hoc Data Mining to Arrive at Their AD8 01-02 Subgroup Analyses As Well as Using An Improper Statistical Significance Standard

166.    Data mining and post-hoc analyses are considered by experts in the field of clinical trials to be wholly improper for purposes of reaching any efficacy conclusions.

167.    Some of the reasons for this are that only at the planning stage can it be determined – using well-accepted biostatical analyses – whether a study group is large enough or a subgroup is adequately "powered" such that conclusions about efficacy can be made. Otherwise, without adequate pre-planned powering, a post-hoc analysis of a subgroup risks false positives.

168.    If subgroups are also to be studied, different biostatistical analyses must be pre-planned and employed for each subgroup. There were no pre-planned sub-group analyses contained in the MMS protocol, nor were any powering calculations performed to ensure that any sub-group analyses were sufficiently powered to ensure against a false positive.

169.    The same is true when a study attempts to analyze multiple endpoints. Thus, if a study investigates multiple endpoints – say two – to reach statistical significance the results must be 0.025 – twice as stringent than the usual 0.05. Or in other words, the analysis must find that its conclusions are correct 97.75 of the time as opposed to being correct 95%. The above corrections are called Bonferroni corrections and are employed when more than one endpoint is being studied in a single RCT.[20]

170.    There were so many endpoints studied in the MMS – over 30 in some versions and at least 4 in the 2016 study published in Advances - that the statistical significance that would be required to be met to make any conclusions about the efficacy of Prevagen for any subgroups would have to be close to 0.00 or to put it in lay persons' terms – it would have to be correct 100% of the time. Just four endpoints would require a statistical significance level of 0.0125 – a statistical level that was not used in the subgroup analysis or, in fact, for the study group as a whole.

171.    As an article in the Food and Drug Law Institute noted– "After Quincy failed to find a treatment effect for the study population as a whole, its researchers conducted more than 30 unplanned post hoc subgroup analyses of the results,[21] looking at data broken down by several variations of small subgroups for each of the nine cognitive tasks. This is a classic example of data dredging or "p-hacking," where researchers perform unplanned analysis following the rejection of an overall null hypothesis with the goal of finding significant effects wherever and however they can be found.[22] If one conservatively assumes 31 subgroups from the "more than 30" subgroup range, the

---

[20] The Bonferroni test, also known as "Bonferroni correction" or "Bonferroni adjustment" "suggests that the p-value for each test must be equal to its alpha divided by the number of tests performed. The Bonferroni test is a multiple-comparison correction used when several dependent or independent statistical tests are being performed simultaneously. The reason is that while a given alpha value may be appropriate for each individual comparison, it is not appropriate for the set of all comparisons. In order to eliminate multiple spurious positives, the alpha value needs to be lowered to account for the number of comparisons being performed." https://www.investopedia.com/terms/b/bonferroni-test.asp.

AMENDED CLASS ACTION COMPLAINT

1    probability of finding at least one false positive at the 0.05 level of statistical significance ("alpha") is

2    the family-wise error rate (FWER) = p = 1 − (1-0.05)^{31} = 0.796 = 80%. An 80% probability of finding

3    at least one false positive in an unplanned *post hoc* subgroup analysis provides compelling evidence of

4    a deficiency in the study's methodology. As such, *post hoc* subgroup analysis is suitable only for

5    generating new hypotheses for future studies; thus, it is inappropriate for generating definitive results

6    and establishing Prevagen's efficacy in the Madison Memory Study.[23]" Degnan et al., "Strengthening

7    the Regulations of Dietary Supplements – Lessons from Prevagen." Food and Drug Law Institute, Winter

8    2021, attached as Exhibit 11.

9        172.    And as for the subgroup analysis cited by Defendants in their marketing of Prevagen, the

10   authors of this article note that, "Given the 80% minimum Type 1 error rate previously calculated for

11   30-plus comparisons, these statistically significant findings are very likely false positive and not reliable

12   evidence of a treatment effect… and The final and decisive shortcoming of Quincy's subgroup analysis

13   was its failure to use multiple testing procedures to control for family-wise error rate (FWER). These

14   procedures include the Bonferroni correction and the Benjamin- Hochberg methods which are well-

15   known statistical practices…. Compared to the Bonferroni and B-H criteria, the results for subgroups

16   AD8 0-1 and 0-2 are in fact not statistically significant; therefore, Prevagen's efficacy cannot be proved

17   both in the study subgroups and in the entire study population." *Id.*

18       173.    And while clinical trials are routinely conducted – testing multiple endpoints – when they

19   get to be as large as the number tested in the MMS, such a study can only be used for exploratory

20   purposes to find a hypothesis that might later be tested in an RCT –like that Prevagen is effective for

21   those with MCI. But for any number of reasons, the subgroup analysis relied upon by Defendants to

22   make the representations they do about Prevagen are wholly improper.

23       174.    Moreover, although any properly conducted clinical trial uses biostatistics and persons

24   with expertise in biostatistics to determine whether there are sufficient numbers of study subjects such

25   that the study is sufficiently powered to be relied upon, there is no discussion of any such powering

26   calculations for the MMS as a whole and by definition, given that the subgroup analyses were not pre-

27   planned and post hoc, they could not and did not have any of the required per protocol pre-planned

28   powering calculations.

AMENDED CLASS ACTION COMPLAINT

175.    Powering calculations are routinely discussed in reliable RCTs, so that other scientists and biostatisticians who might read the study report can determine whether the statistical analyses employed were proper. In fact, this is the process of science – articles are published so that the world of scientists can review or even replicate the experiments reported in a study report.

176.    And the fact that a study report is published in a "peer-reviewed" publication does not mean that the publication endorses the reported results, the conclusions of its authors or even that the study was properly conducted and thus reliable.  Peer-review publication serves one purpose – to provide the scientific community with the results of a study and sufficient information so that if they so chose they can replicate the study – replication being the touchstone of the scientific method.

177.    Thus, it must also be assumed that in the absence of any powering discussions in the published version of the MMS that no powering was performed at all – yet another fatal flaw in the MMS as a whole and the subgroup analysis cited by Defendants in their marketing of Prevagen. Moreover, the absence of any powering information precludes the scientific community from attempting to replicate the study.

178.    As a result, the subgroup analyses relied upon by Defendants to claim efficacy  and represent that Prevagen is "clinically tested" and effective for those with mild cognitive problems cannot and should not be relied upon for such conclusions.

179.    Thus, Defendants' claims about Prevagen being clinically tested, which in turn means to the reasonable consumer that Prevagen is clinically proven or shown to provide the represented brain health claims are themselves false, misleading, and deceptive statements independent of the brain health falsehoods/representations.

## **Summary of Key Points**

180.     The only reason a consumer would purchase Prevagen is to obtain the advertised brain health benefits, which it does not provide.

181.    As more fully set forth above, Defendant Underwood and the Quincy Corporate Defendants advertised and promoted Prevagen during the pre-injunction period with the brain health claims – "improves memory" and "supports healthy brain function, sharper mind and clearer think"

AMENDED CLASS ACTION COMPLAINT

prominently displayed on the front of the package.[21]

182.     The fact that Defendants prominently advertised Prevagen's purported brain health benefits on the front label (as opposed to only on the back label), in bold text, demonstrates that Defendants are aware that its consumers specifically seek out supplements to improve their brain health, cognitive functions, and memory and they are actively promoting their brain health claims to consumers.

183.     Otherwise, Defendants would not devote limited and valuable labeling real estate to such claims. Indeed, other than "clinically tested" the brain health claims are the only marketing claims made on the products' front labels.

184.     Defendants intended for Plaintiff and the Class members to be deceived or misled by the brain health, brain function, and memory representations. Defendants' deceptive and misleading practices proximately caused harm to the Plaintiffs and the Class.

185.     As a result of Defendant's false, misleading, and deceptive brain health, brain function, and memory representations, consumers – including Plaintiff and members of the proposed Class – have purchased Products that do not perform as advertised and are worthless for purposes of brain health, brain function, or improving/maintaining memory.

186.     Whether a product is clinically tested or not is also important information to a reasonable consumer and they would not have purchased Prevagen if they were aware of the false, misleading, and deceptive representations and labeling of the products by Defendants.

187.     Plaintiff brings this action on behalf of herself and other similarly situated consumers who purchased Prevagen and who were exposed to the above mentioned brain health representations (be they pre-injunction or post- injunction), to obtain redress for those who have purchased Prevagen from July 22, 2020 to the date that Defendants complied with the injunction in December 2024.[22] Plaintiff and

---

[21] https://prevagen.com/collections/brain-health-memory-improvement-supplements (last visited October 4, 2023) but, post-injunction, now not available via the above link, even with a search of the Wayback Machine.

[22] July 22, 2020 is the end date of a claims made class action settlement that could not have achieved approval in any circuit but for the Eleventh Circuit which at the time permitted a settlement that paid the class under $1 million but the attorneys close to $2.6 million. While the Prevagen settlement was not objected to, since then the Eleventh Circuit rejected a similar settlement entered into by the same plaintiffs' attorneys for another brain health supplement with similar dismal results for the class. *See Williams et al. v. Reckitt Benskiser LLC et al.*, No. 22-11232 (11th Cir. Apr. 12, 2023).

AMENDED CLASS ACTION COMPLAINT

members of the Proposed Class were injured by Defendants' false, fraudulent, unfair, deceptive, and misleading practices and conduct. Accordingly, Plaintiff seeks compensatory damages and equitable remedies for themselves(s) and members of the Proposed Class.

### JURISDICTION AND VENUE

188.    This Court has original jurisdiction pursuant to 28 U.S.C. §1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and is a class action in which there are in excess of 100 class members and some members of the Class are citizens of a state different from Defendants.

189.    This Court has personal jurisdiction over Defendants because the Qunicy corporate Defendants are authorized to conduct and do business in California, including this District. And as alleged above it was Defendant Underwood who directed and caused Prevagen to be marketed, promoted, distributed, and sold Prevagen in California. As a result, Defendants have sufficient minimum contacts with this State and/or sufficiently availed themselves of the markets in this State through the promotion, sales, distribution and marketing within this State, including this District, to render the exercise of jurisdiction by this Court permissible.

190.    Venue is proper in this Court pursuant to 28 U.S.C. §§1391(a) and (b) because a substantial part of the events giving rise to Plaintiff's claims occurred while she resided in this judicial district. Venue is also proper under 18 U.S.C. §1965(a) because Defendants transact substantial business in this District.

### PARTIES

191.    During the relevant time period, Plaintiff Louise Hudis resided in Bakersfield, California. In the relevant time period, Plaintiff Hudis was exposed to and saw Defendant's brain function and memory representations by first hearing about them from television ads she saw on TV prior to her purchase where she saw the front label of the Prevagen bottle displayed in the advertising as well as hearing the ads expressly state the brain health representations made on the labeling. It was in reliance on these brain health representations made in the tv ads that on or about August 6, 2023, Plaintiff Hudis, went to the Amazon web site and – again seeing the front of the Prevagen label prominently displayed, further confirming what she had seen and heard in the television ads, and in reliance on Defendants'

brain health representations, purchased her first and only bottle of Prevagen capsules. In fact, the receipt generated in connection with her purchase from Amazon itself repeats what she saw in the tv ads and on the Amazon website as it states "Prevagen Improves Memory – Supplement for Better Brain Health, Supports Healthy Brain Function." Because the product did nothing for her in any way she stopped taking the product. She paid $37.95 for her Prevagen purchase. The Prevagen product Plaintiff Hudis purchased did not and could provide the represented brain health benefits including that they could not improve memory or support healthy brain function as represented. As a result, Plaintiff Hudis suffered injury in fact and lost money. Had Plaintiff known the truth about Defendants' misrepresentations, she would not have purchased Prevagen.

192.    Defendant Quincy Bioscience Holding Company, Inc. is a Wisconsin corporation with its principal place of business at 726 Heartland Trail, Suite 300, Madison, Wisconsin. Quincy Bioscience Holding Company, Inc. transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, Quincy Bioscience Holding Company, Inc., through its wholly-owned subsidiaries, has advertised, marketed, promoted, distributed, or sold Prevagen to consumers throughout the United States, including California employing and touting the above described brain health representations on product labels/packaging, on the website and in the TV commercials to induce Plaintiff and the class to purchase Prevagen.

193.    Defendant Quincy Bioscience, LLC is a wholly-owned subsidiary of Quincy Bioscience Holding Company, Inc. It is a Wisconsin limited liability company with its principal place of business at 726 Heartland Trail, Suite 300, Madison, Wisconsin. Quincy Bioscience, LLC transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, Quincy Bioscience, LLC has advertised, marketed, promoted, distributed, or sold Prevagen to consumers throughout the United States, including California employing and touting the above described brain health representations on the product labels/packaging, on the website and in the TV commercials to induce Plaintiff and the class to purchase Prevagen.

194.    Defendant Prevagen, Inc., also doing business as Sugar River Supplements, is a wholly-owned subsidiary of Quincy Bioscience Holding Company, Inc. It is a Wisconsin corporation with its principal place of business at 726 Heartland Trail, Suite 300, Madison, Wisconsin. Prevagen, Inc.

transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, Prevagen, Inc. has advertised, marketed, promoted, distributed, or sold Prevagen to consumers throughout the United States, including California employing and touting the above described brain health representations on the product labels/packaging, on the website and in the TV commercials to induce Plaintiff and the class to purchase Prevagen.

195.    Defendant Quincy Bioscience Manufacturing, LLC is a wholly-owned subsidary of Quincy Bioscience Holding Company, Inc. It is a Wisconsin corporation with its principal place of business at 726 Heartland Trail, Suite 300, Madison, Wisconsin. Quincy Bioscience Manufacturing, LLC transacts or has transacted business in this district and throughout the United States. At all times material to this Complaint, acting alone or in concert with others, Quincy Bioscience Manufacturing, LLC has advertised, marketed, promoted, distributed, or sold Prevagen to consumers throughout the United States, including California employing and touting the above described brain health representations on the product labels/packaging, on the website and in the TV commercials to induce Plaintiff and the class to purchase Prevagen.

196.    Defendant Mark Underwood ("Underwood") is the co-founder and President of Quincy Bioscience Holding Company, Inc., Quincy Bioscience, LLC, and Prevagen, Inc. Underwood is a member of the Board of Directors of Quincy Bioscience, LLC, Prevagen, Inc., and Quincy Bioscience Manufacturing, LLC and a shareholder of Quincy Bioscience Holding Company, Inc., owning 33 percent of shares, the largest individual ownership interest. Underwood, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States, including California by employing the above described brain health representations in the Prevagen marketing including the front of the label representations to induce Plaintiff and the class to purchase Prevagen..

197.    At all times material to this Complaint, acting alone or in concert with others, Underwood has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Quincy Bioscience Holding Company, Inc., Quincy Bioscience, LLC, and Prevagen, Inc., including the acts and practices set forth in this Complaint. Underwood is a member of the marketing creative team, serving as the final decision maker on advertising claims across all channels of distribution and media platforms.

198.    Defendants Quincy Bioscience Holding Company, Inc., Quincy Bioscience, LLC, Prevagen, Inc., and Quincy Bioscience Manufacturing, LLC (collectively, "Corporate Defendants") have operated as a common enterprise while engaging in the deceptive acts and practices alleged below. These Corporate Defendants have conducted the business practices described herein through an interrelated network of companies that have common ownership, officers, managers, business functions, employees, and office locations.

199.    Because Defendant Underwood and the Quincy Corporate Defendants have operated as a common enterprise, each of them is jointly and severally liable for the acts and practices alleged below. Defendant Underwood have formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Corporate Defendants that constitute the common enterprise. In fact, although the jury in the New York Attorney General's lawsuit were instructed that the Mr. Underwood was not a defendant in the State of New York's lawsuit, the evidence was so persuasive against Defendant Underwood that the jury found that he acted in concert with the Quincy Corporate Defendants and thus they found that he too had engaged in consumer fraud.

### CLASS DEFINITION AND ALLEGATIONS

200.    Plaintiff brings this action on behalf of herself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class against Defendants for violations of California state law and/or similar laws in other states:

> **California -Only Class Action**
> All California consumers who since July 22, 2020, purchased Prevagen until the Defendants complied with the December 2024 injunction. Excluded from this Class are Defendants and the officers, directors and employees of any Quincy related entity and those who purchased Prevagen for the purpose of resale.[23]

201.    ***Numerosity.*** The members of the Class are so numerous that joinder of all members of the Class is impracticable. Plaintiff is informed and believes that the proposed Class contains thousands

---

[23] Contemporaneous with the filing of this complaint, Plaintiff's counsel will send Defendants a 30-day letter under the CLRA and Warranty statutes, and if Defendants do not provide complete class-wide relief, Plaintiff will amend her complaint to add these claims as well.

AMENDED CLASS ACTION COMPLAINT

of purchasers of Prevagen who have been damaged by Defendant's conduct as alleged herein. The precise number of Class members is unknown to Plaintiff.

202. ***Existence and Predominance of Common Questions of Law and Fact***. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following:

(a) whether Defendants' representations discussed above are misleading, or objectively reasonably likely to deceive;

(b) whether the alleged conduct constitutes violations of the laws asserted;

(c) whether Defendants engaged in false or misleading advertising;

(d) whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss; and

(e) whether Plaintiff and Class members are entitled to other appropriate remedies, including corrective advertising and injunctive relief.

203. ***Typicality***. Plaintiff's claims are typical of the claims of the members of the Class because, *inter alia*, all Class members were injured through the uniform misconduct described above and were subject to Defendants' deceptive brain function and memory representations that accompanied each and every bottle of Prevagen as well as Defendants' other marketing efforts such as TV commercials. Plaintiff is also advancing the same claims and legal theories on behalf of herself and all members of the Class.

204. ***Adequacy of Representation***. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiffs intend to prosecute this action vigorously. Plaintiff has no adverse or antagonistic interests to those of the Class.

205. ***Superiority***. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for members of the Class, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even

if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

206.    Unless a Class is certified, Defendants will retain monies received as a result of their conduct that was taken from Plaintiff and Class members.

## COUNT I

## California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*

215.    Plaintiff repeats and realleges the allegations set forth above as if fully contained herein.

216.    Plaintiff brings this cause of action individually and on behalf of the Class.

217.    Defendant has violated California Business and Professions Code § 17200 by engaging in unfair, unlawful, and/or fraudulent business acts or practices as described in this Complaint, including but not limited to, disseminating or causing to be disseminated from the State of California, unfair, deceptive, untrue, or misleading advertising as set forth in this Complaint.

218.    Defendant's practices are likely to deceive, and have deceived, members of the public.

219.    Defendant knew, or should have known, that its misrepresentations, omissions, failure to disclosure and/or partial disclosures omit material facts and are likely to deceive a reasonable consumer.

220.    Defendant continued to make such misrepresentations despite the fact it knew or should have known that its conduct was misleading and deceptive.

221.    By engaging in the above-described acts and practices, Defendant committed one or more acts of unfair competition within the meaning of Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, *et seq.*

222.    Plaintiff and all members of the Class suffered injury in fact as a result of Defendant's unfair methods of competition. As a proximate result of Defendant's conduct, Plaintiff and members of the Class were exposed to these misrepresentations and omissions, purchased the Product in reliance on these misrepresentations, and suffered monetary loss as a result.

223.    Plaintiff, individually and on behalf of the Class, seeks an order of this Court against Defendant awarding restitution, disgorgement, injunctive relief and all other relief allowed under § 17200, *et seq.*, plus interest, attorneys' fees and costs.

## COUNT II

### California False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, *et seq.*

224.    Plaintiff repeats and realleges the allegations set forth above as if fully contained herein.

225.    Plaintiff brings this cause of action individually and on behalf of the Class.

226.    Defendant is a Wisconsin company disseminating advertising in California and throughout the United States.

227.    Defendant has engaged in a systematic campaign of advertising and marketing its supplement products as effective. In connection with the sale of its products, Defendant disseminated or caused to be disseminated false, misleading, and deceptive advertising regarding the availability of travel insurance and the scope of coverage provided in the place of insurance. Defendant's agents sold a Product that it knew was not effective.

228.    When Defendant disseminated the advertising described herein, it knew, or by the exercise of reasonable care should have known, that the statements concerning its Product were untrue or misleading, or omitted to state the truth about the scope of the coverage provided, in violation of the False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*

229.    As a proximate result of Defendant's conduct, Plaintiff and members of the Class were exposed to these misrepresentations, omissions and partial disclosures, purchased the Product in reliance on these misrepresentations, omissions and partial disclosures, and suffered monetary loss as a result. They would not have purchased the Product, or would have paid significantly less for it, had they known the truth regarding the effectiveness of the Product.

230.    Defendant made such misrepresentations despite the fact that it knew or should have known that the statements were false, misleading, and/or deceptive.

231.    There were reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein.

232.    Pursuant to Business and Professions Code §§ 17203 and 17535, Plaintiff and the

members of the Class seek an order of this Court enjoining Defendant from continuing to engage, use, or employ the above-described practices in advertising the sale of the Product.

233.    Likewise, Plaintiff seeks an order requiring Defendant to make full corrective disclosures to correct its prior misrepresentations, omissions, failures to disclose, and partial disclosures.

234.    On information and belief, Defendant has failed and refused, and in the future will fail and refuse, to cease its deceptive advertising practices, and will continue to do those acts unless this Court orders Defendant to cease and desist pursuant to California Business and Professions Code § 17535.

235.    Plaintiff, individually and on behalf of the Class, seeks restitution, disgorgement, injunctive relief, and all other relief allowable under § 17500, *et seq.*

## COUNT III

## Unjust Enrichment

236.    Plaintiff and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

237.    Plaintiff brings her claims individually and on behalf of the Class.

238.    Defendant misrepresented on each and every Product package, their web site and TV commercials, the misrepresentations, falsehoods and deceptions alleged herein.

239.    Plaintiff has suffered injury in fact and lost money or property as a result of Defendants' conduct because she purchased Prevagen in reliance on Defendants' misrepresentations, deceptions and falsehoods alleged herein but did not receive a Product as represented.

240.    Defendant knew that Prevagen could not conform to their representations.

241.    Defendant mispresented, concealed, and omitted material information concerning Prevagen.

242.    The facts mispresented, concealed, and omitted by Defendant are material because a reasonable consumer would have considered them to be important in deciding whether to purchase Prevagen or pay a lower price.

243.    Defendant mispresented, concealed, and omitted material information concerning Prevagen in order to induce Plaintiff and Class members to purchase Prevagen at a substantially higher

price than what they would otherwise have paid.

244. Plaintiff and Class members reasonably and justifiably relied on Defendant's representations and advertisements when purchasing Prevagen.

245. Plaintiff and Class members would not have purchased Prevagen if they knew the truth, or they would have only paid substantially less.

246. Plaintiff and Class members conferred substantial benefits on Defendant by purchasing Prevagen at a premium without receiving a product that conformed to Defendant's representations.

247. As a result of its deception, Defendant has been able to reap unjust revenue and profit.

248. Defendant knowingly and willingly accepted and enjoyed these benefits.

249. Defendant's retention of these benefits would be inequitable because Defendant obtained benefits to the detriment of Plaintiff and Class members when Plaintiff and Class members did not obtain their promised benefits.

250. Plaintiff, on behalf of herself, all others similarly situated, and the general public, seeks restitution as a result of Defendant's unjust conduct.

## <u>COUNT IV</u>

### <u>(Violation of California Consumers Legal Remedies Act (CLRA), Cal. Civil Code 1750; 1770)</u>

251. Plaintiff and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

252. Plaintiff brings her claims individually and on behalf of the Class.

253. As alleged herein, Plaintiff has suffered injury in fact and lost money or property as a result of Defendants' conduct because she purchased Prevagen in reliance on Defendants' misrepresentations, deceptions and falsehoods alleged herein but did not receive a Product as represented.

254. The California Consumers Legal Remedies Act (CLRA), (Cal. Civil Code §§ 1750; 1770) and similar laws in other states, prohibits misrepresenting that goods have characteristics, ingredients, uses, or benefits that they do not have.

255. Defendants misrepresented on each and every Product package, their web site and TV commercials, the misrepresentations, falsehoods and deceptions alleged herein.

256.    Plaintiff and other members of the Class have in fact been deceived as a result of their exposure to and reliance on Defendant's material representations, which are described above. This has caused harm to Plaintiff and other members of the Class who each purchased the Prevagen products. Plaintiff and the other Class members have suffered injury in fact and lost money as a result of these unlawful, unfair, and fraudulent practices.

257.    As a result of its deception, Defendants have been able to reap unjust revenue and profit.

258.    Plaintiff, on behalf of herself, all others similarly situated, and the general public, provided reasonable notice to Defendants of the claims alleged herein. Specifically, Plaintiff sent a notice letter dated October 9, 2025, to Defendants QUINCY BIOSCIENCE HOLDING COMPANY, INC. and etc. Defendants have not provided the relief requested.

259.    Plaintiff, on behalf of herself, all others similarly situated, and the general public, seeks restitution of all money obtained from Plaintiff and the members of the Class collected as a result of Defendants' consumer frauds.

## COUNT V

## Breach of Express Warranties

260.    Plaintiff and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

261.    Plaintiff brings her claims individually and on behalf of the Class.

262.    Defendant's marketing, advertising, representations, and labeling of Prevagen constitute an express warranty pursuant to California Code, Civil Code – CIV §§ 1791 to 1795.

263.    Defendant misrepresented on each and every Product package, their web site and TV commercials, the misrepresentations, falsehoods and deceptions alleged herein.

264.    Plaintiff has suffered injury in fact and lost money or property as a result of Defendants' conduct because she purchased Prevagen in reliance on Defendants' misrepresentations, deceptions and falsehoods alleged herein but did not receive a Product as represented.

265.    Defendant breached the warranty because they were unwilling or unable to provide Plaintiff and Class members with a product that met Defendant's representations, and any attempt to provide a remedy has been ineffective.

266.    Defendant's breach deprived Plaintiff and Class members of the benefit of the bargain.

267.    Defendant's attempt to disclaim or limit the warranty is unconscionable and unenforceable under the circumstances here because Defendant knowingly sold Prevagen using false, misleading, and deceptive representations.

268.    The essential purpose of the warranty failed because Plaintiff and Class members are unable to reasonably obtain a workable remedy pursuant to the terms of the warranty, so Plaintiff and Class members are entitled to a remedy that is not limited by the terms of the warranty.

269.    Plaintiff and Class members have complied with all obligations under the warranty or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

270.    As a result of its deception, Defendant has been able to reap unjust revenue and profit.

271.    Plaintiff, on behalf of herself, all others similarly situated, and the general public, provided reasonable notice to Defendants of the claims alleged herein. Specifically, Plaintiff sent a notice letter dated October 9, 2025, to Defendants QUINCY BIOSCIENCE HOLDING COMPANY, INC. and etc. Defendants have not provided the relief requested.

272.    Plaintiff, on behalf of herself, all others similarly situated, and the general public, seeks damages as a result of Defendant's unlawful conduct.

**COUNT VI**

**Breach of Implied Warranties**

273.    Plaintiff and Class members reallege and incorporate by reference each allegation set forth above and further allege as follows.

274.    Plaintiff brings her claims individually and on behalf of the Class.

275.    The sale of Prevagen created an implied warranty of merchantability pursuant to California Code, Civil Code – CIV § 1791.1.

276.    Defendant misrepresented on each and every Product package, their web site and TV commercials, the misrepresentations, falsehoods and deceptions alleged herein.

277.    The lack of any substantial nutritional value compared to Defendant's representations caused Prevagen to be unmerchantable because Prevagen cannot perform their essential functions

according to what the average purchaser would reasonably expect.

278.   Plaintiff has suffered injury in fact and lost money or property as a result of Defendants' conduct because she purchased Prevagen in reliance on Defendants' misrepresentations, deceptions and falsehoods alleged herein but did not receive a Product as represented.

279.   Defendant breached the warranty because they were unwilling or unable to provide Plaintiff and Class members with a product that met Defendant's representations, and any attempt to provide a remedy has been ineffective.

280.   Defendant's breach deprived Plaintiff and Class members of the benefit of the bargain.

281.   Defendant's attempt to disclaim or limit the warranty is unconscionable and unenforceable under the circumstances here because Defendant knowingly sold Prevagen using false, misleading, and deceptive representations.

282.   The essential purpose of the warranty failed because Plaintiff and Class members are unable to reasonably obtain a workable remedy pursuant to the terms of the warranty, so Plaintiff and Class members are entitled to a remedy that is not limited by the terms of the warranty.

283.   Plaintiff and Class members have complied with all obligations under the warranty or otherwise have been excused from performance of said obligations as a result of Defendant's conduct described herein.

284.   As a result of its deception, Defendant has been able to reap unjust revenue and profit.

285.   Plaintiff, on behalf of herself, all others similarly situated, and the general public, provided reasonable notice to Defendants of the claims alleged herein. Specifically, Plaintiff sent a notice letter dated October 9, 2025, to Defendants QUINCY BIOSCIENCE HOLDING COMPANY, INC. and etc. Defendants have not provided the relief requested.

Plaintiff, on behalf of herself, all others similarly situated, and the general public, seeks damages as a result of Defendant's unlawful conduct

**PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for a judgment:

A.  Certifying the Class as requested herein;

B.  An award of Plaintiff's and the class's damages; or

C.  Awarding restitution and disgorgement of Defendant's revenues to Plaintiff and the proposed Class members as unjust enrichment;

D.  Awarding attorneys' fees and costs; and

E.  Providing such further relief as may be just and proper.

Dated: November 13, 2025            By: _____

Thom E. Smith (SBN 203362)
Ling Y. Kuang (SBN 296873)
Michael McShane (SBN 127944)
**AUDET & PARTNERS LLP**
711 Van Ness Ave., Ste. 500
San Francisco, CA 94102
t: (415) 568-2555
mmcshane@audetlaw.com

Stewart M. Weltman
*To be admitted pro hac vice*
**HART MCLAUGHLIN & ELDRIDGE**
One South Dearborn, Suite 1400
Chicago, Illinois 60603
t: (312) 504-1988
sweltman@hmelegal.com

Charles E. Schaffer
*To be admitted pro hac vice*
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut St., Ste. 500
Philadelphia, PA 19106
t: (215) 592-1500
cschaffer@lfsblaw.com

Charles LaDuca
*To be admitted pro hac vice*
**CUNEO GILBERT & LADUCA, LLP**
2445 M Street, N.W., Suite 740
Washington, D.C. 20037
t: (202) 789-3960
charles@cuneolaw.com

*Attorneys for Plaintiff*

AMENDED CLASS ACTION COMPLAINT